

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ANGELA MEDLIN, YSIDRO RENTERIA, and MOZELLE CARR | § | No. 08-24-00001-CV |
| | § | Appeal from |
| Appellants/Cross-Appellees, | § | 143rd District Court |
| v. | § | of Loving County, Texas |
| AMBER MARIE KING, JAMES ALAN SPARKS, and HOLLY DIANE JONES, | § | (TC# 22-12-1075) |
| Appellees/Cross-Appellants. | § | |

**OPINION**

In West Texas's rich Permian Basin, with 671 square miles of desert terrain, up against New Mexico, graced by the Pecos River, and flanked by Reeves, Ward, and Winkler Counties, sits Loving County[1]—home to more wildlife than voters. There, perhaps more than anywhere, does the maxim "every vote matters" ring true.

## I. BACKGROUND

In this Loving County election contest proceeding, three unsuccessful candidates challenge the November 2022 general election. The disappointed candidates—Amber Marie King, James

---

[1] Sources: *See* TEXAS STATE HISTORICAL ASSOCIATION, https://www.tshaonline.org/handbook/entries/loving-county (last visited June 13, 2024); TEXAS ALMANAC, https://www.texasalmanac.com/places/loving-county, (last visited June 13, 2024).

Alan Sparks, and Holly Diane Jones (collectively, Contestants)—sued the prevailing candidates—Angela Medlin, Ysidro Renteria, and Mozelle Carr (collectively, Contestees)—under Texas Election Code § 221.003. Contestants alleged that the election results were inaccurate because, among other things, illegal votes were counted and eligible voters were prevented from voting in local races. In particular, Contestants challenged the residency of 26 voters based on the recently modified statutory definition of "residence."[2] *See* Tex. Elec. Code Ann. §§ 1.015; 221.003(a)(1), (b). The contested election results are as follows:

Loving County and District Clerk
Holly Diane Jones: 34
Mozelle Carr: 46

Justice of the Peace
Amber Marie King: 39
Angela Medlin: 39

County Commissioner Precinct 2
James Alan Sparks: 6
Ysidro Renteria: 12

After a bench trial, the district court determined that ten individuals who registered and voted in Loving County do not qualify as residents and were not eligible to vote in the election. It

---

[2] Tex. Elec. Code Ann. § 1.015 presently reads:

   (a) In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.

   (b) A person may not establish residence for the purpose of influencing the outcome of a certain election.

   (c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

   (d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

   (e) A person who is an inmate in a penal institution or who is an involuntary inmate in a hospital or eleemosynary institution does not, while an inmate, acquire residence at the place where the institution is located.

   (f) A person may not establish a residence at any place the person has not inhabited. A person may not designate a previous residence as a home and fixed place of habitation unless the person inhabits the place at the time of designation and intends to remain.

2

subtracted the illegal votes from the vote totals in the three contested races. The court then affirmed the outcome of the Loving County and District Clerk's race, declaring Mozelle Carr the winner. *See* Tex. Elec. Code Ann. § 221.012(a) ("If the tribunal hearing an election contest can ascertain the true outcome of the election, the tribunal shall declare the outcome."). But after subtracting the illegal votes from the Justice of the Peace and County Commissioner Precinct 2 races, the court concluded it could not ascertain the true outcome of either election and declared both void. *See* Tex. Elec. Code Ann. § 221.012(b) ("The tribunal shall declare the election void if it cannot ascertain the true outcome of the election."). The court ordered new elections for the two voided elections.

Contestants, Contestees, and two sets of Non-Party Voters[3] filed separate notices of appeal. Contestants have moved to dismiss Contestees' constitutional claims regarding the recent amendments to § 1.015[4] and have also moved to dismiss the Non-Party Voters based on lack of standing. Contestees and Non-Party Voters challenge the trial court's ruling that permitted Contestants' trial subpoenas to issue and its decision to allow expert testimony from Contestants' proffered witness on utility usage data. Contestants challenge the trial court's conclusion that they failed to prove Loving County election officers prevented two eligible voters from voting in local races, as well as the trial court's decision not to require Loving County to hire a third party to run

---

[3] One set comprises members of the Renteria family: Marcella Renteria, Marisa Renteria, Michael Renteria, Joe Renteria, Sylvia Renteria, and Senaida Polanco. The other consists of Rachel Jones, RayChel Lowrance, and Wesley Lowrance. We refer to the two sets collectively as the "Non-Party Voters."

[4] In 2021, subsection (b) was changed from "Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code" to "A person may not establish residence for the purpose of influencing the outcome of a certain election." Act of May 13, 1985, 69th Leg., R.S., ch. 211, § 1, sec. 1.015(b), 1985 Tex. Gen. Laws 802, 1077 (codified at Tex. Elec. Code Ann. § 1.015(b)). Additionally, subsection (f) was added, which reads: "A person may not establish a residence at any place the person has not inhabited. A person may not designate a previous residence as a home and fixed place of habitation unless the person inhabits the place at the time of designation and intends to remain." Act of May 25, 2021, 87th Leg., R.S., ch. 869, § 1, sec. 1.015, 2021, Tex. Gen. Laws 2142, 2143 (codified at §1.015 Tex. Elec. Code Ann.)

the second election. And the primary issue before us on appeal focuses on the trial court's determinations regarding the residency of individual voters.[5]

## II. ELECTION CONTESTS

An election contest is a special statutory proceeding that provides a remedy for elections tainted by fraud, illegality, or other irregularity. *Blum v. Lanier*, 997 S.W.2d 259, 262 (Tex. 1999). In considering an election contest, the district court's obligation is to determine:

> whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because:
>
> (1) illegal votes were counted; [6] or
>
> (2) an election officer or other person officially involved in the administration of the election:
>
>     (A) prevented eligible voters from voting;

---

[5] Given the multiple parties and issues on appeal, we do not attempt to adhere to the parties' presentation of issues in their individual appellate briefs but instead address every issue throughout the opinion as substantively appropriate. In the interest of completeness, however, the parties' issues as stated in their respective appellate briefs are enumerated below:

Contestants raise the following issues: (1) Contestees cannot challenge the constitutionality of a statute in an election contest; (2) Loving County election workers illegally prevented two eligible voters (McQueen and Mayers) from voting in local races; (3 & 4) the trial court abused its discretion by finding certain voters to be residents, including members of the Renteria, Haley, and Jones-Carr families; (5) the trial court correctly admitted expert testimony from Steve Ragland; (6) the trial court correctly denied Contestees' complaints about the trial subpoenas; and (7) the trial court abused its discretion in not ordering the County to hire a third party to run the new election.

Contestees raise the following issues: (1) insufficient evidence supports the trial court's striking ten voters on the basis of residency, including other members of the Renteria and Jones-Carr families and William Wilkinson; (2) the trial court erred by finding recent amendments to the election code constitutional, both facially and as-applied; (3) the trial court erred by not quashing Contestants' trial subpoenas; and (4) the trial court erred by permitting expert testimony from Steve Ragland on Constestants' behalf.

The Non-Party Voters group consisting of Rachel Jones, RayChel Lowrance, and Wesley Lowrance raise the following issues: (1) the trial court erred in concluding that Rachel Jones was not a resident of Loving County; (2) the trial court erred in concluding that RayChel Lowrance and Wesley Lowrance were not residents of Loving County; and (3) the trial court abused its discretion by failing to grant their motions for protective orders regarding the trial subpoenas.

The Non-Party Voters group consisting of members of the Renteria family raise the following issues: (1) the trial court erred in determining that Senaida Polanco, Sylvia Renteria, Joe Renteria, Michael Renteria, Marisa Renteria, and Marcella Renteria were not residents of Loving County; and (2) the trial court abused its discretion by failing to grant their motions for protective orders.

[6] In this context, an "illegal vote" means a vote that is not legally countable. Tex. Elec. Code Ann. § 221.003(b).

4

(B) failed to count legal votes; or

(C) engaged in other fraud or illegal conduct or made a mistake.

Tex. Elec. Code Ann. § 221.003(a).

An election contestant bears the burden of alleging and proving by clear and convincing evidence that (1) violations of the Election Code occurred, and (2) they materially affected the outcome of the election. *Willet v. Cole*, 249 S.W.3d 585, 589 (Tex. App.—Waco 2008, no pet.) (citing Tex. Elec. Code Ann. § 221.003); *accord Rodriguez v. Rangel*, 679 S.W.3d 890, 903 (Tex. App.—San Antonio 2023, pet. denied); *Woods v. Legg*, 363 S.W.3d 710, 713 (Tex. App.— Houston [1st Dist.] 2011, no pet.). If the trial court can determine the candidate for whom an illegal vote was cast, it must subtract that vote from the candidate's official total. Tex. Elec. Code Ann. § 221.011. And if the trial court can determine the true outcome of the election after following this procedure, it must declare the outcome. *Slusher v. Streater*, 896 S.W.2d 239, 241 (Tex. App.— Houston [1st Dist.] 1995, no writ) (citing Tex. Elec. Code Ann. § 221.012(a)). If it cannot, however, it must declare the election void. *Id.* (citing Tex. Elec. Code Ann. § 221.012(b)).

## III. ANALYSIS

### A. Motion to dismiss

Contestants filed a motion to dismiss two aspects of this appeal. First, they argue that Contestees cannot challenge the constitutionality of a statute in an election contest. Second, they ask us to dismiss both sets of Non-Party Voters for lack of standing.

#### (1) We do not reach Contestees' constitutionality challenge.

In their original answer to this suit, Contestees first raised as an affirmative defense a challenge to portions of the recently passed Senate Bill 1111, which, among other things, modified the definition of "residency" under Texas Election Code § 1.015. Contestees contended S.B. 1111

5

is both facially unconstitutional and unconstitutional as applied to them under the Texas and United States constitutions.

At the start of the nine-day bench trial, the presiding judge confirmed that Contestees had preserved their constitutional challenge and granted Contestants a running objection to their contention that the court lacked jurisdiction to hear this challenge. Although the trial court's ruling on the issue is not express, it impliedly found the statute constitutional.

On appeal, Contestants move to dismiss Contestees' challenge to the constitutionality of Texas Election Code §§ 1.015(b) and (f), re-urging the arguments they raised at the trial court.[7] Specifically, Contestants argue that Contestees attempt to raise constitutional claims that are beyond the jurisdiction of courts in an election contest, contending that election contests are statutorily limited to matters that pertain strictly to the election itself. That is, Contestants urge that an election contest is not the proper vehicle to try a "peripheral issue" to the election—even one that forms the basis for rendering votes legal or illegal. Contestants maintain that Contestees can challenge the constitutionality of the residency provisions, but they must do so through a separate lawsuit.

Contestees respond that courts have both the "authority and obligation" to hear constitutional challenges that would directly affect the outcome of an election contest. They contend that Contestants conflate "jurisdiction," or the court's power to decide a case, with the "scope" of an election contest, which Contestees maintain can include consideration of constitutional challenges, particularly those that are "directly relevant" to the court's inquiry.[8]

---

[7] Contestants moved to dismiss Contestees' constitutionality claims before Contestees filed their appellate brief. We carried the motion to dismiss with the case and consider it now that the issue is properly before us.

[8] Contestees also note that a federal district court in fact found Texas Election Code §§ 1.015(b) and (f) unconstitutional, but the Fifth Circuit reversed based on plaintiffs' lack of standing. *Texas State LULAC v. Elfant*, 629 F.Supp.3d 527, 545–48 (W.D. Tex. 2022), *rev'd and rendered*, 52 F.4th 248 (5th Cir. 2022), *cert. denied sub nom.*

An election contest is not an ordinary civil suit but a statutorily created special proceeding that provides "a remedy for elections tainted by fraud, illegality or other irregularity." *Blum*, 997 S.W.2d at 262 (citing *De Shazo v. Webb*, 113 S.W.2d 519, 524 (Tex. 1938)); *Rossano v. Townsend*, 9 S.W.3d 357, 361 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing *Duncan v. Willis*, 302 S.W.2d 627, 630 (Tex. 1957)). Except as otherwise specified, the Election Code confers the district court with exclusive original jurisdiction of an election contest. Tex. Elec. Code Ann. § 221.002(a). The election contest statute "does not limit a provision of this code or another statute expanding the scope of inquiry in an election contest." *Id.* § 221.003(c). However, the district court's authority is "limited to the subjects or grounds expressly or impliedly authorized by the election code." *City of Granite Shoals v. Winder*, 280 S.W.3d 550, 557 (Tex. App.—Austin 2009, pet. denied) (recognizing "that an election contest is not an ordinary lawsuit, but is instead 'a special legislative proceeding'") (citations omitted).

In moving to dismiss Contestees' constitutionality challenge, Contestants rely on cases espousing what they deem the "well established" rule "that the constitutionality of the statute cannot be raised in an election contest." *Setliff v. Gorrell*, 466 S.W.2d 74, 76 (Tex. App.—Amarillo 1971, no writ) (collecting cases); *see also Harrison v. Jay*, 271 S.W.2d 388, 389–90 (Tex. 1954) (concluding court of appeals did not err by refusing a challenge to the validity of

---

*Texas State LULAC v. Torres*, 144 S.Ct. 70 (2023). Importantly, we note that *Elfant* was a section 1983 case brought in federal district court to enjoin certain state election officials from applying S.B. 1111. Its analysis turned on whether S.B. 1111 survives constitutional scrutiny, the rigorousness of which depended on the extent to which its provisions burden the right to vote. *Id.* at 541–42. In stark contrast, here, as a state court of appeals reviewing a trial court's findings in an election contest proceeding, we are both confined to evaluating only whether the trial court abused its discretion and required *not* to assess the constitutional challenge unless we *must* to accomplish our review. *See Kiehne*, 247 S.W.3d at 263 (recognizing the abuse-of-discretion standard of review); *In re Ginsberg*, 630 S.W.3d 1, 10 (Tex. Spec. Ct. Rev. 2018) (citing *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("[A]s a rule, courts decide constitutional questions only when the issue cannot be resolved on non-constitutional grounds.")). Surely, were this Court a federal district court considering a section 1983 claim, or the Texas Legislature making decisions regarding which provisions should or should not be part of the Election Code, our analysis would be entirely different.

orders establishing election precincts because these types of "collateral attacks" are not permitted in an election contest); *Clark v. Stubbs*, 131 S.W.2d 663, 666 (Tex. App.—Austin 1939, no writ) (refusing to consider appellant's argument that statute was unconstitutional because "[t]his is an election contest[,] . . . not a civil suit, and the constitutionality of the statute cannot be attacked in this sort of proceeding"). They also focus on cases that rejected peripheral issues in election contests. *See, e.g.*, *Del Rio Indep. Sch. Dist. of Val Verde Cnty. v. Aldrete*, 398 S.W.2d 597, 600–01 (Tex. App.—San Antonio 1965, writ dism'd) (per curiam) (concluding court lacked jurisdiction to consider argument that boundary line was not properly drawn because "a statutory election contest is not the proper proceeding for establishing a new boundary line").

Contestees object to Contestants' reliance on cases that predate the modern Election Code.[9] But Contestees also rely on authority from an earlier era, namely *Thomas v. Groebl*, 208 S.W.2d 412, 415–16 (Tex. App.—Eastland 1948), *rev'd*, 212 S.W.2d 625 (Tex. 1948). In *Thomas*, contestee-appellants contended H.B. 344 (which amended Article 2968 of the Revised Civil Statutes regarding poll tax exemptions) was unconstitutional because its caption included defective and misleading language, and the statute (both before and after amendment) was unconstitutional because it limited the right to vote. *Id.* at 414. The Eastland Court of Appeals considered these arguments but ultimately disagreed, finding that H.B. 344 was not unconstitutional for either reason and affirming the trial court's judgment disqualifying 45 voters from the election. *Id.* at 414, 416.

---

[9] Although the Election Code was codified in 1986, laws governing elections in Texas have addressed the scope of an election contest since their inception. *See* Act approved April 16, 1895, 24th Leg., R.S., ch. 46, § 17, 1895 Tex. Gen. Laws 58, 62 ("If upon the trial of any contested election case any vote or votes be found to be illegal or fraudulent, the court trying the same shall subtract such vote or votes from the poll of the candidate who received the same, and after a full and fair investigation of the evidence shall decide to which of the contesting parties the office belongs.").

On appeal, the Texas Supreme Court concluded it had jurisdiction because the appeals court "questioned the validity of the statute" (even though it did not find it unconstitutional).[10] *Thomas*, 212 S.W.2d at 627. In reversing the lower courts' decisions, the Court relied on the challenged amendment and statute, but construed it liberally, based on legislative intent, "in favor of the fundamental right to vote" and in a manner that did not implicate the constitutional concerns raised. *Id.* at 632.

It may very well be appropriate to consider the constitutionality of a statute in an election contest proceeding when that issue is central to the election contest itself. But in this case, we need not decide the question. For even if we considered Contestees' constitutional challenges to § 1.015(b) and (f)—and even if we were to assume those provisions are unconstitutional—it makes no difference in the outcome here. None of the trial court's conclusions on any of the individual voters' residency hinge on either provision. As we discuss below, we can affirm all the trial court's conclusions on residency for each challenged voter even setting aside § 1.015(b) and (f)—that is, we can affirm by looking solely to the definition of residency as outlined in § 1.015(a), (c), and (d) and case law. Because we can resolve this case on grounds that do not question the constitutionality of a statute, we must and we do.[11] *See In re Ginsberg*, 630 S.W.3d 1, 10 (Tex. Spec. Ct. Rev. 2018) (citing *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003)) ("[A]s a rule,

---

[10] At the time, the scope of the Texas Supreme Court's appellate jurisdiction was more limited than it is today. Relevant here, it did not permit a writ of error in an election contest unless certain circumstances were at issue, including when the appeals court considered the constitutionality of a statute. *See* Article 1821, Revised Civil Statutes, as amended by Act approved March 2, 1929, 41st Leg., R.S., ch. 33, § 1, art. 1821, 1929 Tex. Gen. Laws 68, 68 as amended by Act approved March 25, 1927, 40th Leg., R.S., ch. 144, § 1, art. 1728, 1927 Tex. Gen. Laws 214, 216; repealed by Act of May 17, 1985, 69th Leg., R.S., ch. 480, § 26(1), 1985 Tex. Gen. Laws 1720, 2050 (codified at Tex. Gov't Code Ann. Title 2).

[11] Residency parameters, including temporary relocation parameters, have been developed throughout Texas jurisprudence, both in common law and statutorily. We adhere to the longstanding applicable law concerning residency discussed below in affirming the trial court's residency conclusions, while setting aside the newly enacted subsections (b) and (f) that add to longstanding law.

courts decide constitutional questions only when the issue cannot be resolved on non-constitutional grounds."); *In re B.L.D.*, 113 S.W.3d at 349 n.9 (collecting cases).

### (2) The Non-Party Voters have standing.

Contestants also moved to dismiss the Non-Party Voters' appeals based on standing. The Non-Party Voters maintain they have standing to appeal the trial court's judgment for two separate and independent reasons: (1) because of the virtual-representation doctrine; and (2) because they have a clear interest in and are bound by the judgment.

Standing is a component of subject-matter jurisdiction. *State v. Naylor*, 466 S.W.3d 783, 787 (Tex. 2015). Generally, only parties of record have standing to appeal the trial court's judgment. *Id.* But a non-party may file an appeal if she is "deemed to be a party" under the doctrine of virtual representation. *Id.* at 789 (citing *Motor Vehicle Bd. of Texas Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 110 (Tex. 1999) (per curiam)). To benefit from that doctrine, the prospective non-party appellant must establish: (1) she is bound by the judgment; (2) her privity of estate, title, or interest appears from the record; and (3) there is an identity of interest between the non-party appellant and a party to the judgment. *Id.* (quoting *El Paso Indep. Auto. Dealers*, 1 S.W.3d at 110).

As to the first requirement, the trial court's judgment—which found each of the Non-Party Voters ineligible to vote in Loving County's 2022 general election—binds them because it precludes them from exercising their right to vote in Loving County (at least in this election). *See id.* (citing *El Paso Indep. Auto. Dealers*, 1 S.W.3d at 110–11). As to the second requirement, the Non-Party Voters each share an identity of interest with the candidates for whom they cast their vote. And as to the third requirement, the privity of interest between Non-Party Voters and

10

Contestants or Contestees is apparent from the record because each Non-Party Voter's vote was subtracted from the trial court's final canvass total in its judgment.

Contestants urge that the doctrine of virtual representation should not apply in an election contest because nothing in the Election Code specifically permits non-party appellants, and as a matter of public policy, the number of individuals who have an interest in an election's outcome may be quite large.[12] It is true that courts must determine whether other considerations—like timing or prejudice—weigh against applying the doctrine.[13] *In re Lumbermens*, 184 S.W.3d 718, 726 (Tex. 2006) (orig. proceeding); *see also Naylor*, 466 S.W.3d at 797 (Boyd, J., concurring) (noting that "equity may justify a denial of . . . intervention in a given case"). Here, however, additional equitable considerations do not weigh against allowing the Non-Party Voters' participation in this appeal. Importantly, Contestants have not identified any prejudice related to the timing of the Non-Party Voters' appeals. *See In re Lumbermens*, 184 S.W.3d at 726. There may be election contests in which equitable concerns do weigh against allowing non-party appellants given the circumstances of that case. But here, where nine of the ten voters found ineligible by the trial court seek to appeal to assert their voting rights and have timely briefed the issues before us, which overlap with those already on appeal, those concerns are not present.

We conclude the Non-Party Voters have standing based on the virtual-representation doctrine.[14] Contestants' motion to dismiss the Non-Party Voters is denied.

---

[12] Contestants cite no caselaw that supports the proposition that virtual representation does not apply in an election contest. At least one court has applied the doctrine in an election contest, opining that "[a] holding to the contrary would do injustice to the spirit of the Texas Election Code, which contemplates that justice be done." *Grizzaffi v. Lee*, 517 S.W.2d 885, 891 (Tex. App.—Fort Worth 1974, writ dism'd) (extending doctrine of virtual representation to party who attempted to intervene post-judgment).

[13] The opposite is not true; that is, the virtual-representation doctrine does not "empower[] the Court to create standing where none exists." *Naylor*, 466 S.W.3d at 791.

[14] Thus, we do not reach their remaining argument in support of standing.

## B. Evidentiary challenges

Contestees and both sets of Non-Party Voters argue the trial court erred by denying their motions for protective order and overruling their objections to several subpoenas duces tecum requiring voters to produce various documents at trial. Specifically, the documents included: (1) driver's licenses; (2) personal identification cards issued by any state agency; (3) concealed handgun licenses; (4) notices of appraised values related to any voter-owned property; (5) voter-owned vehicle and boat registration documents; (6) deeds, mortgages, and mortgage statements for any voter-owned Loving County property; (7) homeowner's and renter's insurance policies for any voter-owned or rented property; (8) utility bills for any property the voter lived in or claimed as residence from May through November 2022; and (9) any document demonstrating residence for voting. Though Contestees and several individual voters sought a protective order, the trial court did not grant the motions or quash the subpoenas. The court also denied the motion to reconsider at trial.

"The right to issue subpoenas is not absolute." *In re El Paso Cnty. Pub. Def.*, No. 08-19-00296-CR, 2021 WL 3260629, at *11 (Tex. App.—El Paso July 30, 2021, orig. proceeding) (not designated for publication); Tex. R. Civ. P. 176.3. A person seeking to avoid or limit the scope of a subpoena may file a motion to quash or motion for protective order. Tex. R. Civ. P. 192.6(a). The trial court may issue a protective order "[t]o protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights." *Id.* 192.6(b). However, we will not disturb a trial court's denial of a motion for protective order absent a showing that it abused its discretion. *Enviro Prot., Inc. v. Nat'l Bank of Andrews*, 989 S.W.2d 454, 456 (Tex. App.—El Paso 1999, no pet.) (citing *General Tire, Inc. v. Kepple*, 970 S.W.2d 520, 526 (Tex. 1998)). A trial court abuses its discretion when it "acts without reference

12

to guiding rules or principles or in an arbitrary or unreasonable manner." *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam).

Contestees and Non-Party Voters argue that Contestants used the subpoenas to "harass and intimidate the voters," "improperly tilt the trial court's findings," and "flip their evidentiary burden" to the voters to prove residency. They object to the requests as irrelevant, invasive of the voters' privacy, and harassing. They also urge that while the Election Code lists specific documents that a voter must provide in response to a residence confirmation notice (including some specifically covered by the subpoenas), the power to request these documents to determine residency lies exclusively with the voter registrar. Tex. Elec. Code Ann. §§ 15.051–.054.

However, Contestees and Non-Party Voters have not established that the trial court abused its discretion by declining to enter a protective order. While their motions generally alleged that the document requests were "unduly burdensome, harassing, and invasions of privacy rights," none of the motions established the particular, specific, and demonstrable injury sufficient to justify a protective order.[15] *In re Wal-Mart Stores, Inc.*, 545 S.W.3d 626, 636 (Tex. App.—El Paso 2016, orig. proceeding) (citing *In re Collins*, 286 S.W.3d 911, 919 (Tex. 2009) (orig. proceeding)). Contestees and Non-Party Voters have not cited authority that supports their argument that the Election Code forecloses discovery of these documents or restricts a party's ability to request these documents. Indeed, the Election Code provides that "[e]xcept as otherwise provided by this subtitle, the rules governing civil suits in the district court apply to an election contest in the district court." Tex. Elec. Code Ann. § 231.002. While "[a] subpoena may not be used for discovery to an extent, in a manner, or at a time other than as provided by the rules governing discovery," the

---

[15] The motions also objected to the timing of the subpoenas and lack of notice, but neither Contestees nor the Non-Party Voters raise those points on appeal.

Rules of Civil Procedure provide that a person may be subpoenaed both to give testimony and produce documents at trial. Tex. R. Civ. P. 176.3(b); 176.6(c) ("A person commanded to produce documents or tangible things need not appear in person at the time and place of production unless the person is also commanded to attend and give testimony, either in the same subpoena or a separate one.").

Contestees and Non-Party Voters have not established how the subpoenaed documents fall outside "the otherwise applicable scope of discovery, which permits discovery of information that 'appears reasonably calculated to lead to the discovery of admissible evidence.'" *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 708 (Tex. 2015) (orig. proceeding) (quoting Tex. R. Civ. P. 192.3(a)); *see* Tex. R. Civ. P. 176.3 ("A subpoena may not be used for discovery to an extent, in a manner, or at a time other than as provided by the rules governing discovery."). Nor have they established that the subpoenaed documents were so irrelevant, invasive of the voters' privacy, and harassing as to leave the trial court with no discretion but to enter a protective order. *See In re Berrenberg*, 605 S.W.3d 922, 926 (Tex. App.—El Paso 2020, orig. proceeding). Thus, Contestees and Non-Party Voters have not shown that the trial court abused its discretion in declining to enter a protective order.

Because Contestees and Non-Party Voters have not established that the trial court acted in an arbitrary or unreasonable manner, or without reference to guiding rules or principles, their challenge to its ruling on the trial subpoenas duces tecum fails.

## C. Contestees' challenges to Contestants' expert's testimony

Contestees argue that the trial court erred by overruling their objections to testimony from Contestants' expert witness, Stephen Ragland, who testified regarding the energy usage at several of the challenged voters' addresses and opined on typical electricity levels for an inhabited home.

Specifically, Contestees contend Ragland lacked qualifications; his testimony was not based on specialized knowledge, was irrelevant, and lacked a sufficient basis and reliability; and his testimony's prejudice outweighed any of its probative value. Contestees maintain the trial court's decision to permit Ragland's testimony constitutes reversible error because the court expressly relied on his testimony to conclude it was "improbable" that anyone resided on the Renteria farm and thus determine six members of the Renteria family cast illegal votes. Contestees objected based on Texas Rules of Evidence 401, 402, 403, 702, 703, and 704.

### (1) Standard of review and applicable law

"A trial court has an obligation to [ensure] that only relevant and reliable expert opinions are admitted into evidence." *Tenet Hosps., Ltd. v. Garcia*, 462 S.W.3d 299, 307 (Tex. App.—El Paso 2015, no pet.). There are three prerequisites for the admission of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be grounded in scientific, technical, or other specialized knowledge; and (3) the testimony must help the fact-finder understand the evidence admitted at trial or determine a disputed fact. Tex. R. Evid. 702. Built into the second and third prerequisites are the requirements that the testimony be relevant and reliable. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995); *Tenet Hosps.*, 462 S.W.3d at 307. The relevancy requirement incorporates a traditional relevancy analysis under Rules 401 and 402. *Robinson*, 923 S.W.2d at 556. Evidence is irrelevant if it has no relationship to any issues in the case. *Id.* Irrelevant evidence is thus inadmissible under Rules 401, 402, and 702.[16] *Id.*

The trial court does not determine whether the expert's conclusions are correct but rather whether the analysis he used to reach them is reliable. *Hernandez v. Moss*, 538 S.W.3d 160, 170 (Tex. App.—El Paso 2017, no pet.) (citing *Gamill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d

---

[16] To that end, we consider Contestees' challenges to relevance and reliability together.

713, 728 (Tex. 1998)). Unreliable evidence is not helpful to the fact-finder and is thus inadmissible under Rule 702. *Robinson*, 923 S.W.2d at 557. The criteria for assessing reliability varies depending on the nature of the evidence. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 579 (Tex. 2006). However, in determining whether expert testimony is reliable, courts commonly consider the six non-exclusive *Robinson* factors:

1. the extent to which the theory has been or can be tested;

2. the extent to which the technique relies upon the subjective interpretation of the expert;

3. whether the theory has been subjected to peer review and/or publication;

4. the technique's potential rate of error;

5. whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

6. the non-judicial uses which have been made of the theory or technique.

*Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 74 (Tex. 2023) (citing *Robinson*, 923 S.W.2d at 557). These factors are not always determinative in assessing reliability, and expert testimony is reliable if the trial court can otherwise assess its reliability. *Innovative Block of S. Texas, Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 422 (Tex. 2020) (citing *Helena Chemical*, 47 S.W.3d at 499). Indeed, in some cases, "[e]xperience alone may provide a sufficient basis for an expert's testimony . . . ." *Gammill*, 972 S.W.2d at 726. But "the trial court 'should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Mack Trucks*, 206 S.W.3d at 579 (citing *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002)). And the proponent must provide the court with "some way of assessing the reliability of objected-to expert testimony, apart from the expert's credentials and say-so." *Helena Chem.*, 664 S.W.3d at

74 (citing *Gammill*, 972 S.W.2d at 726). That is, "[t]he mere *ipse dixit* of the expert . . . will not suffice." *Id.* at 73 (citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009)).

"[E]xpert testimony is unreliable if 'there is simply too great an analytical gap between the data and the opinion proffered.'" *Helena Chem.*, 664 S.W.3d at 74 (quoting *Gammill*, 972 S.W.2d at 727). "Analytical gaps may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015) (citations omitted).

"A trial court has broad discretion in determining whether expert testimony is admissible." *Mack Trucks*, 206 S.W.3d at 578. We review the admission or exclusion of expert testimony for abuse of discretion. *Id.* at 578; *accord Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996) (reviewing trial court's determination on expert's qualifications for abuse of discretion). A trial court abuses its discretion when it acts without regard to guiding rules or principles. *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (quoting *Broders*, 924 S.W.2d at 151).

**(2) The trial court did not abuse its discretion in concluding Ragland was qualified to testify as an expert.**

Contestees challenge Ragland's qualifications as an expert under Rule 702. They contend that neither Ragland's resume nor his testimony demonstrated he had the knowledge, skill, experience, training, or education to opine on appliance use and statistical norms for customary electricity usage. They also object that Ragland did not have personal knowledge of Loving County, including its residents' lifestyles or home sizes. Constestants urge that Ragland is qualified as an expert in statistical norms for customary energy consumption patterns, and his lack of

17

specialized knowledge of Loving County or its residents' utility usage is inapposite because analyzing Loving County residents' energy use was part of Ragland's professional experience.

Ragland, a CPA and retired regulatory vice president of Oncor Utility,[17] appeared on Contestants' behalf to provide expert testimony regarding the energy usage exhibits and his opinion on normal electricity levels for an inhabited home. Ragland's resume noted that his over-50-year career in the state electric and utility industry included various functions such as utility billing, corporate accounting, preparing reports for various regulatory bodies, and analyzing electrical usage data. He testified that based on his experience, he could interpret utility records to determine an individual customer's usage, which would inform his opinion on whether a home was occupied. Specifically, Ragland testified that "analysis of use per customer, the analysis of use by service type; residential, commercial, industrial is an integral part of [his] work in the utility industry." Further, he noted his opinion was also based on average residential energy consumption in Texas (for various types of homes) and local climate.

The trial court did not act without reference to guiding rules in determining Ragland was qualified to testify as an expert. We conclude Ragland's knowledge and experience would aid the trial court in understanding the utility usage evidence. Contestants established that Ragland has the "knowledge, skill, experience, training, or education regarding the specific issue before the court" that deemed him qualified to give an opinion on the subject—that is, experience in interpreting utility usage data to help the trial court determine whether a home was inhabited. *Broders*, 924 S.W.2d at 153 (internal quotation marks omitted); *cf. Rangel*, 679 S.W.3d at 898–99 (concluding trial court did not abuse its discretion in determining elections administrator with one-

---

[17] Oncor Utility is a transmission and distribution utility that provides energy to users who pay a separate retail electric provider for their energy use.

and-a-half years' experience was qualified to provide expert testimony in election contest); *Von Hohn v. Von Hohn*, 260 S.W.3d 631, 636–37 (Tex. App.—Tyler 2008, no pet.) (concluding that witness with experience calculating partner's interest in law firm was qualified to testify as expert despite having never used information from a patent case to perform calculation). On this record, the trial court did not abuse its discretion by determining Ragland was qualified as an expert and admitting his testimony.

### (3) The trial court did not abuse its discretion in concluding Ragland's testimony was reliable.

Contestees' main point on this issue focuses on the reliability of Ragland's testimony. They claim Ragland's testimony is unreliable because he based his opinions in part on "several Internet blogs" (specifically referencing three). In particular, they object to a blog which Ragland stated he referenced "as a source for how long the average [refrigerator] cycled." Contestees maintain this site "lacked a reliable foundation concerning refrigerator standards, how those standards were tested, what techniques were used, rates of error, and how such data was accepted in the scientific community." Contestees also object to Ragland's visit to an RV park to gather data about RV energy usage. Contestees challenge Ragland's testimony to the extent that he relied upon insufficient underlying facts or data based on his reference to these sources, which they maintain lack specific knowledge regarding Loving County.

Contestees urge that Ragland's testimony is akin to the proffered expert in *Warren v. Hartnett*, 561 S.W.2d 860 (Tex. App.—Dallas 1977, writ ref'd n.r.e.). In that case involving a will contest, a handwriting expert testified that due to alcoholism, the decedent did not have sufficient mental ability to understand the nature and extent of her property and thus properly execute a will. *Id.* at 863. However, the court of appeals concluded the testimony had no probative effect because the "witness did not demonstrate any special training or experience in the observation or treatment

19

of persons with mental disorders." *Id.* Instead, the witness testified that she had "lots of experience" with alcoholics and had seen their handwriting. *Id.* The Dallas court concluded "mere association of alcoholics and examination of their handwriting is not sufficient 'special experience' to qualify . . . as an expert in the fields of alcohol-related disorders and the effects of those disorders on a person's handwriting." *Id.*

Here, however, Ragland said his opinion was "based on [his] 50-plus years of experience" in the electric and utility industry, which included analyzing consumer energy use. In other words, Ragland's resume included the same "special experience" he used in his testimony on Contestants' behalf. Though Ragland acknowledged his testimony was not specific to Loving County, he affirmed that his analysis was "to establish some level of norms" regarding residential utility usage.[18] He generally testified that he referred to the complained-of blogs "to support [his] opinion." But he noted that his data came from many other sources, including "highly regulated sources" like the Public Utility Commission and Federal Energy Regulatory Commission. And he described the method by which he analyzed monthly electricity usage data per address and thus formed an opinion as to whether the home at that address was occupied.

Although the *Robinson* factors are largely inapplicable given the facts, the trial court could otherwise assess the reliability of Ragland's testimony. *See Innovative Block of S. Texas*, 603 S.W.3d at 422 (citing *Helena Chemical*, 47 S.W.3d at 499). Ragland's testimony does not represent "too great an analytical gap between the data and the opinion proffered" or amount to "nothing more than a recitation of his credentials and a subjective opinion." *Ford Motor Co. v.*

---

[18] For example, Ragland testified that while the energy used daily varies, the average monthly consumption is 1,100 to 1,300 kWh for a residential home in Texas and 600 kWh for an RV. Ragland noted that these numbers are driven by common household appliances, so a home's load-factor ratio—or the amount of electricity used at a location given its demand over time—demonstrates the frequency of an appliance usage (and thus inform whether someone was living at that address).

*Ledesma*, 242 S.W.3d 32, 40 (Tex. 2007) (internal citations omitted). Instead, Ragland outlined his methodology, provided his source data, and described the many years of experience he had analyzing the same data. *Cf. Rangel*, 679 S.W.3d at 898–99 (finding expert's opinion neither speculative nor conclusory when expert testified to his method for evaluating inaccuracies in election and the facts supporting his opinion). Any analytical "gaps" that remain between the foundational data and Ragland's conclusion drawn from it go to the weight of his testimony, not its reliability. *Transcont'l Ins. Co. v. Crump*, 330 S.W.3d 211, 220 (Tex. 2010) (citing *Ledesma*, 242 S.W.3d at 40–41). That is, Contestees put up a forceful defense to Ragland's testimony, but the trial court, as the fact-finder, was entitled to accept it.

We conclude the trial court did not abuse its discretion in determining Ragland's testimony was based on a sufficiently reliable foundation under Rule 702 and relevant under Rules 401 and 402. We overrule Contestees' challenges to Ragland's testimony.

### (4) The trial court did not abuse its discretion when it declined to exclude Ragland's testimony based on Rule 403.

Last, Contestees urge that the prejudice of Ragland's testimony outweighed any of its probative value, so the trial court should have excluded it under Rule 403. Specifically, Contestees object that Ragland's opinions were prejudicial and weighed the evaluation of bodily presence over the voters' testimony on residency. They also object to his testimony as unnecessarily cumulative. Contestants assert that Ragland's testimony on this topic assisted the trial court in its consideration of the case because physical presence is a component of residency.

While relevant evidence is presumed admissible, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018) (quoting Tex. R. Evid. 403). The proper inquiry is focused on "unfair prejudice"—meaning "an undue

21

tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (quoting *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018)).

Determining residency under the Election Code has long depended on several factors, including a person's volition, intent, and action. *See Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex. 1964). A court must necessarily consider a person's bodily presence in assessing residence. *See id.*; *Streater*, 896 S.W.2d at 244. Thus, Ragland's testimony is directly linked to one of the components a trial court must consider in determining residency in an election contest. Though Contestees maintain Ragland's testimony "unfairly skewed the evaluation of bodily presence" over the voters' own testimony, they have not established how so. The cases Contestees cite in support of their Rule 403 argument iterate the general principles that determining residence requires consideration of several factors, including bodily presence and intention, neither of which are solely determinative. *Mills*, 377 S.W.2d at 637 ("Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined."); *accord State v. Fischer*, 769 S.W.2d 619, 624 (Tex. App.—Corpus Christi 1989, writ dism'd w.o.j.); *Fields v. Cotten*, 383 S.W.2d 84, 86 (Tex. App.—Beaumont 1964, no writ) (per curiam). Even if we were to rely on this authority, it would merely reinforce the relevance of Ragland's testimony without speaking to its purported unfair prejudice.[19]

Contestees failed to establish that the trial court abused its discretion by not excluding Ragland's testimony on Rule 403 grounds.

---

[19] The case mentioned by the dissent, *Rodriguez v. Thompson*, 542 S.W.2d 480, 483–84 (Tex. App.—El Paso 1976, no writ), similarly underscores the relevance of utility data to the physical-presence component of the residency analysis and highlights that this type of evidence has long been considered in election contests with residency challenges, even before the modern codification of the Election Code and far before the subsection (f) amendment to § 1.015.

We overrule their issue on this point.

## D. Residency

The focus of this appeal involves the trial court's findings as to the individual voters' residency. Contestants agree with the trial court's determination that ten voters were not residents of Loving County but contend it abused its discretion in not finding more, particularly those with similar circumstances to the nonresidents. Contestees urge this Court to reverse the trial court's judgment regarding the ten voters, asserting that the trial court's findings regarding their residency is not supported by sufficient evidence. Between Contestants and Contestees, the trial court's findings as to the residency of 19 voters are challenged on appeal.

### (1) Standard of review and applicable law

Generally, an individual must vote in the election precinct in which she resides. Tex. Elec. Code Ann. § 11.003. The Election Code defines residence as "domicile," or "one's home and fixed place of habitation to which one intends to return after any temporary absence." *Id.* § 1.015(a). It further defines the parameters of residency as follows:

> (b) A person may not establish residence for the purpose of influencing the outcome of a certain election.[20]
>
> (c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.
>
> (d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.
>
> .   .   .
>
> (f) A person may not establish a residence at any place the person has not inhabited. A person may not designate a previous residence as a home and fixed place of

---

[20] The Legislature revised subsection (b) in 2021. Previously, 1.015(b) stated: "Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code." Acts 1985, 69th Leg., ch. 211, § 1, eff. Jan. 1, 1986 (amended 2021) (current version at Tex. Elec. Code § 1.015(b)).

habitation unless the person inhabits the place at the time of designation and intends to remain.[21]

Tex. Elec. Code Ann. § 1.015.

While the Legislature recently amended, courts have long found the term "residence" difficult to define in this context. *See Mills*, 377 S.W.2d at 637; *Kiehne v. Jones*, 247 S.W.3d 259, 264 (Tex. App.—El Paso 2007, pet. denied). "Its meaning hinges on the circumstances surrounding the person involved and depends in great extent on the present intent of the individual." *Kiehne*, 247 S.W.3d at 264 (citing *Mills*, 377 S.W.2d at 637). In determining residence, courts consider multiple elements, including the person's volition, intention, and action. *Id.* (citing *Mills*, 377 S.W.2d at 637). Relevant conduct may include where a person sleeps or keeps her personal belongings, as those actions support bodily presence and intent. *Id.* (citing *Mills*, 377 S.W.2d at 637). However, if someone makes statements concerning her residence "that are inconsistent with the facts showing actual residence, such statements 'are of slight weight' and cannot establish residence in fact." *In re Graham*, 251 S.W.3d 844, 850 (Tex. App.—Austin 2008, orig. proceeding) (quoting *Texas v. Florida*, 306 U.S. 398, 425 (1939)); *accord Rangel*, 679 S.W.3d at 915; *State v. Wilson*, 490 S.W.3d 610, 618 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *McDuffee v. Miller*, 327 S.W.3d 808, 820 (Tex. App.—Beaumont 2010, no pet.).

"An election contestant's burden is a heavy one, and the declared results will be upheld in all cases except when there is clear and convincing evidence of an erroneous result." *Flores v. Cuellar*, 269 S.W.3d 657, 660 (Tex. App.—San Antonio 2008, no pet.). That is, an election will not be overturned unless an election contestant proves voting irregularities materially affected the

---

[21] Subsection (f) is a new addition to section 1.015 implemented with the 2021 amendments. *See* Acts 2021, 87th Leg., ch. 869 (S.B. 1111), § 1, eff. Sept. 1, 2021. As explained section III.A.(1) above, setting aside both § 1.015(b) and (f), the following analysis concludes that the trial court did not abuse its discretion in its residency determinations.

results. *Id.*; Tex. Elec. Code Ann. § 221.003(a)–(b). In the context of a residency challenge, that means the court begins with the presumption that a cast vote was legal—i.e., made by a resident in the territory covered by the election. *See* Tex. Elec. Code Ann. § 11.001(a)(2). To overcome that presumption in a residency challenge, an election contestant must show by clear and convincing evidence that an individual voter does not have the proper residence under § 1.015. *See Rangel*, 679 S.W.3d at 903.

We review the trial court's judgment in an election contest for abuse of discretion. *Kiehne*, 247 S.W.3d at 263. An abuse of discretion occurs when the trial court's decision is arbitrary and unreasonable such that it constitutes a clear and prejudicial legal error. *Id.* (citing *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992)). "The sufficiency of evidence supporting a trial court's finding of fact may be a relevant factor in determining whether the court abused its discretion." *Jones v. Morales*, 318 S.W.3d 419, 423 (Tex. App.—Amarillo 2010, pet. denied).

In considering a legal sufficiency challenge under a clear and convincing standard, we view the evidence in the light most favorable to the judgment to determine if the fact-finder could have reasonably formed a firm belief or conviction that the finding was true. *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002)). We presume the fact-finder resolved disputed facts in favor of its findings so long as a reasonable fact-finder could do so, and we disregard any contrary evidence if a reasonable fact-finder could do so. *Id.* However, we cannot disregard undisputed facts. *Id.*

In considering a factual sufficiency challenge under a clear and convincing standard, "we 'must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing.'" *Galvan v. Vera*, No. 04-18-00309-CV, 2018 WL 4096383, at *3 (Tex. App.—San Antonio Aug. 29, 2018, no pet.) (mem. op.) (quoting *In re J.F.C.*, 96 S.W.3d at 266). Evidence is factually insufficient only "if 'the disputed evidence that a reasonable factfinder

could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction.'" *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

Still, "[w]e give a great deal of deference to the trial court, as the trier of fact, in its determination of both the credibility of the witnesses and the weight of their testimony." *Kiehne*, 247 S.W.3d at 263 (citing *Streater*, 896 S.W.2d at 245). The trial court also has the discretion to resolve conflicts arising from evidence, so we cannot overturn its judgment unless the record makes clear the trial court could have reached only one result. *Id.* (citing *Walker*, 827 S.W.2d at 839–40). However, the trial court has no discretion in determining the law or applying the law to the facts. *Pressley v. Casar*, 567 S.W.3d 327, 333 (Tex. 2019). When, as here, a complete reporter's record is part of the record, the trial court's challenged findings of fact are not binding on the court of appeals. *Pearl Res. LLC v. Charger Servs., LLC*, 622 S.W.3d 106, 115 (Tex. App.—El Paso 2020, pet. denied). That is, the court of appeals may look to the record—as we have here—to assess whether the evidence sufficiently supports the findings. *See Browne v. Ortiz*, 657 S.W.3d 704, 708 (Tex. App.—El Paso 2022, no pet.).

Here, the trial court found ten voters were not eligible to vote in Loving County based on residency and subtracted those votes from the vote totals. It found the remaining challenged voters to be residents of Loving County and thus eligible to vote in its election. We examine the trial court's findings on each challenged voter raised on appeal to determine whether the trial court abused its discretion. *Kiehne*, 247 S.W.3d at 264.

### (2) Members of the Renteria family

Eight members of the Renteria family are at issue in this appeal. Contestants challenge the trial court's findings that two members of the Renteria family are residents: Arnulfo Molinar and Ysidro Renteria. Contestees challenge the trial court's findings that six members of the Renteria

26

family are not residents: Senaida Polanco, Sylvia Renteria, Jose "Joe" Renteria, Michael Renteria, Marisa Renteria, and Marcella Renteria.[22]

Contestants make two main arguments applicable to all members of the Renteria family. First, they emphasize that eight contested voters from the Renteria family claimed the same address in Loving County as their residence. Contestants note that the property includes an RV, a three-bedroom main house, and a cabin, but the main house sustained significant damage—including ruined floors and moldy ceilings—in a 2014 flood, with family members giving contradictory testimony as to when the property was habitable.

Second, Contestants rely on Ragland's testimony regarding the amount of electricity used at the property during 2022, contending the property must have been largely unoccupied during the election year. They point to the trial court's finding that Ragland's analysis showed "it was improbable that anyone was residing at the property," noting that this conclusion, which supported its finding that six Renterias are not residents, compels the conclusion that the other two Renterias—who also claimed that property as their residence—are not residents of Loving County.

Contestees address their arguments on appeal specific to each challenged voter, and we consider them in turn below.

### (a) Arnulfo Molinar

The trial court determined Arnulfo Molinar, Ysidro Renteria's half-brother, is a Loving County resident. It found Arnulfo grew up in Loving County and stays at the Renteria family property "three or four times" each month.

---

[22] Because many of the challenged voters share the same last name, we refer to individuals by their first name. In doing so, we intend no disrespect.

Contestants argue the trial court erred by finding Arnulfo to be a Loving County resident, pointing to his documentary evidence, which they contend shows he lives in Midland. Contestants emphasize that the trial court agreed with Ragland's conclusion that no one lived at the Renteria property, so Arnulfo could not be staying there "three or four times" per month. And Contestants urge that Arnulfo's residency facts are "not very different" from the other members of the Renteria family found not to be Loving County residents.

Arnulfo testified that he was raised in Mentone[23] and considers it to be his home, noting that he has never voted or served on a jury anywhere else. He said he works in and visits Mentone "pretty often" or "about three or four times per month" but plans to make Loving County his permanent home "someday." Arnulfo is retired but helps his son, who lives in Midland, with his dirt construction business, which has work contracts in Loving County. When Arnulfo is in Mentone, he testified that he stays "at our house," or the house he shares with his siblings (i.e., other members of the Renteria family). He noted that he leaves clothes at the Mentone house but takes them home to wash. Arnulfo was served with the subpoena duces tecum while in Midland but did not bring any of the documentation with him to trial. He testified to receiving mail at his Loving County P.O. box because "that's our address," though he admitted to not having a key. While Arnulfo's Statement of Residence lists Mentone as his address, he admitted that his passport reflects his Midland address. But he noted that he considers his time in Midland to be "temporary" and stays in an RV while he is there.

Arnulfo demonstrated both bodily presence in Loving County and intent to make Loving County his permanent home. Although his work has landed him temporarily in Midland, this fact does not negate his Loving County residence. *See McGehee v. Boedeker*, 200 S.W.2d 697, 698

---

[23] Mentone is the seat of Loving County.

(Tex. App.—Amarillo 1947, no writ) ("A voter does not lose his residence for voting purposes merely because he in good faith is only temporarily absent therefrom due to ill health *or for business or professional reasons.*" (emphasis added)); *cf. Guerra v. Pena*, 406 S.W.2d 769, 776 (Tex. App.—San Antonio 1966, no writ) (holding that migrant workers, who spend several months each year outside the county where they vote, were nonetheless residents of the county where they maintained their permanent residence). The trial court did not abuse its discretion in finding that Contestants failed to present clear and convincing evidence to defeat Arnulfo's Loving County residency and thus concluding Arnulfo was eligible to vote in Loving County in the November 8, 2022 election.

### (b) Ysidro Renteria

The trial court determined Ysidro Renteria is a Loving County resident. As relevant to his residency, the trial court found Ysidro's driver's license lists his Mentone address, though he also owns property in Reeves County and Oklahoma. The trial court found Ysidro moved into the cabin on the Renteria property after the flood and noted Ysidro bought more land in Loving County after the flood. It also found Ysidro "always intends to return" to Loving County.

Contestants argue that the documentary evidence establishes that Ysidro lives in Reeves County and has not lived in Loving County in many years. They point out that Ysidro maintains a homestead exemption on his Reeves County property, and he changed the address on his driver's license from Pecos[24] to Loving County in 2021 after receiving a letter from a state investigator regarding the residency of Loving County public officials. Contestants also emphasize that Ysidro and his wife are retired now, yet they have not moved their lives to Loving County.

---

[24] Pecos is the seat of Reeves County.

Ysidro testified that he was born and raised in the main house on the Renteria family's property in Loving County. Growing up, Ysidro helped his father work on their family's farms in both Loving and Reeves counties. Ysidro testified that he too farmed land in both Loving and Reeves counties until the early 1980s, when he began focusing his farming operations on the Reeves County land. But about a decade ago, Ysidro stopped farming and now considers his primary employment to be Loving County's Commissioner. Ysidro testified that he owns an investment property in Oklahoma but visits only once every two months. And while Ysidro admitted that his wife and children live in Pecos, he stated that he considers Loving County to be his home, as he always has. Ysidro testified that in a typical month, he spent "maybe two" weeks in Pecos with his wife but otherwise stays at the Loving County property or visits Oklahoma. Ysidro also confirmed that his driver's license reflects his Mentone address.

While there was conflicting evidence regarding Ysidro's residency, the trial court, as the fact-finder, acted within its discretion by resolving those inconsistencies. Because sufficient evidence supports its conclusion that Contestants failed to meet their burden in challenging Ysidro's Loving County residency, the trial court did not abuse its discretion in finding that Ysidro is a resident of Loving County and was eligible to vote there in the November 8, 2022 election.

### (c) Senaida Polanco

The trial court determined Senaida Polanco—Ysidro's sister—is not a Loving County resident, finding instead that she lives in Fort Worth and "has for years." The trial court found that during Senaida's forty-plus year marriage, she and her husband have lived outside of Loving County, and she visits Loving County just once or twice per year. Thus, the court found "Senaida has not demonstrated any volition or action to return to Loving County." To that end, the court found Senaida's children and grandson all live in the Dallas-Fort Worth area, and "most of"

Senaida's belongings are in Fort Worth, which is also her mailing address and the address on her driver's license. Though the court found Senaida "has plans to live in Mentone full time," it characterized those plans as "vague" and based on a nonspecific date of her husband's retirement.

Contestees and Renteria family Non-Party Voters urge that Senaida is a Loving County resident and lives in Fort Worth only because her husband is employed there, not because she intends for it to be her permanent residence. They contend that Senaida has always voted in Loving County and served on Loving County juries throughout the years. In sum, Contestees characterize Senaida's absence from Loving County as temporary and contend the trial court abused its discretion in determining she is not a resident.

Senaida testified that she grew up in Mentone on the Renteria family's property. She confirmed that she got married in Odessa[25] before moving to Fort Worth. Senaida admitted she spends most of her time in Fort Worth and was served with the trial subpoena there. But she testified she considers Mentone home and returns "just whenever I choose to come out," though she noted that was "more than twice a year." Senaida testified that she mixed up her mailing address and her residence on her Statement of Residence form, noting that she did not intend to put her Fort Worth address down as her residence.

Although Senaida may have expressed intent to return to Mentone in the future, there was sufficient evidence upon which the trial court could have formed a firm belief that her volition, action, and intent to reside in Loving County is too attenuated to establish residency. Thus, the trial court did not abuse its discretion in determining that Contestants met their burden to prove by clear and convincing evidence that Senaida did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

---

[25] Odessa is the seat of Ector County.

### (d) Sylvia Renteria

The trial court determined Sylvia Renteria—Ysidro's sister—is not a resident of Loving County. It found Sylvia grew up in Mentone but left for Pecos in the 1980s when she got married and has remained there since. The court found multiple sources confirmed Sylvia's Pecos residence, including her driver's license, the testimony of two of her brothers, her vehicle registration, and an oil and gas lease. The court recognized Sylvia's testimony that she considers her Pecos address "temporary" but noted she has a chronic health condition that prevents her from moving to Loving County. In sum, the court found that "[o]ther than her stated intent and visits to clean up the [Renteria family's] property, the evidence shows Sylvia lives in Pecos in Reeves County," not Loving County.

Contestees and Renteria family Non-Party Voters contend Sylvia is a Loving County resident, arguing that she has never voted anywhere besides in Loving County. They emphasize that once Sylvia's health improves, she intends to exclusively live in Loving County, which is where she considers her permanent home.

Sylvia testified that she grew up in Loving County and lived at the Renteria family's home until she married her now-ex-husband. Though she agreed that she moved to Pecos in the 1980s, she said she stays at the Renteria family home five to seven days per month and wants to move there permanently in the future. Sylvia characterized her home in Pecos as "just a house," while the Renteria family home "means everything" to her. But she agreed that she had "no timeline" for improving her health to the extent that she could move to Mentone permanently.

There was sufficient evidence upon which the trial court could have formed a firm belief that Sylvia's intent to return to Loving County after a temporary absence is too attenuated to establish residency. Thus, the trial court did not abuse its discretion in determining that Contestants

met their burden to prove by clear and convincing evidence that Sylvia did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (e) Jose "Joe" Renteria

The trial court determined Jose "Joe" Renteria—Ysidro's brother—is not a resident of Loving County. While the court found Joe claims the Renteria family's home as his residence address with a Loving County P.O. box as his mailing address, it found "[a]ll of the documentary evidence shows Joe lives in Odessa," including his driver's license and documentation Joe brought in response to the trial subpoena. The court also found that Joe "had no timeline, despite being retired for 13 years" for his plans to move back to Loving County, namely due to medical issues.

Contestees and Renteria family Non-Party Voters argue that Joe is a Loving County resident, pointing to his voter registration certificate listing the Renteria family's home address and the fact that he keeps his clothing and other belongings there. They also urge that Joe has only ever voted in Loving County and considers it his home. But for Joe's health issues, they contend Joe would live full time in Loving County, as he visits frequently. And they characterize the trial court's focus on the documentary evidence as ignoring the relevant legal inquiry under § 1.015(a).

Joe testified that he served as the former County Commissioner in Loving County for 20 years and considers Loving County, where he raised his children, to be his home. But he acknowledged that his driver's license lists his Odessa home as his address and that he has a homestead exemption on that property, where he has lived for ten years. He also acknowledged various pieces of mail sent to him at that address as well, including his vehicle registration renewal, utility bill for the Renteria family's home in Loving County, and correspondence from his insurance company. Though Joe testified he intends for Loving County to be his permanent home, he visits the Renteria family's home approximately once a month due to medical care he receives

33

in Odessa. He also testified that he mistakenly filled out the address on his Statement of Residence card by first listing his Odessa address, then changing it to his Mentone address.

Although Joe, like his siblings, expressed general intent to return to Mentone in the future, there was sufficient evidence upon which the trial court could have formed a firm belief that his bodily presence and intent to reside in Loving County is too tenuous to establish residency. Thus, the trial court did not abuse its discretion in determining that Contestants met their burden to prove by clear and convincing evidence that Joe did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (f) Michael Renteria

The trial court determined Michael Renteria—Ysidro's nephew and Joe's son—is not a Loving County resident. Contestees and Renteria family Non-Party Voters contend the trial court erred because Michael expressed familiarity with personal items in the Renteria family's home. They also argue that Michael is essentially "temporarily 'deployed' to Fort Worth—not for military service—but to earn a living." In sum, they focus on Michael's intent to return to Loving County in the future as determinative evidence of his residency.

Michael testified that he grew up in Mentone. He stated that now, he lives in Fort Worth, where he is raising his two young children with his girlfriend. He stated that he works onsite for a trucking company in Fort Worth and has held this job for five years. After Michael was discharged from his military service in 2012, he attended a technical training program in Arlington, where he and his ex-wife owned a home at the time. His driver's license and vehicle registration addresses reflect his Arlington and Fort Worth homes. Though Michael stated that he has always considered Mentone home and intends to return, he cited childcare responsibilities and the lack of job opportunities in Loving County as reasons he has not yet done so. Specifically, he testified that his

"concrete plan" to return is on hold until he has "no family to support," alternatively noting "if I win the lottery, I'll come back."

There was sufficient evidence upon which the trial court could have formed a firm belief that Michael's volition, action, and intent to reside in Loving County is too attenuated to establish residency. Thus, the trial court did not abuse its discretion in determining that Contestants met their burden to prove by clear and convincing evidence that Michael did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (g) Marisa Renteria

The trial court determined Marisa Renteria—Ysidro's niece and Joe's daughter—is not a Loving County resident but instead lives in Odessa, where she was served with the trial subpoena. It found that Marisa's oldest child attends school in Odessa, and she has plans for her younger child to attend school in Odessa as well. The court noted that Marisa grew up in Loving County but has not lived there since high school and has never held a job there.

Contestees and Renteria family Non-Party Voters argue the evidence establishes that Marisa is a Loving County resident, pointing to the fact that she has voted and served on juries in Loving County. Though they concede Marisa has lived in various other cities, they contend Loving County is her only intended permanent residence.

Marisa testified that she grew up in Mentone in the Renteria family's home. She described various jobs she has held in Odessa, Kermit,[26] and Lubbock,[27] noting that her current job was between Midland and Odessa. Marisa acknowledged that she is currently living with her father in Odessa, which is also where her car is registered and the address on her driver's license. She could

---

[26] Kermit is the seat of Winkler County.

[27] Lubbock is the seat of Lubbock County.

not remember how often she visited the Renteria family's house in Mentone but described her visits as "every once in a while" and "usually . . . on the weekends." Marisa remembered visiting Mentone that year "probably . . . a couple of times" but could not remember any details. Still, she characterized the Renteria family's home as her "permanent home here in Mentone."

Although Marisa testified that she considers Loving County her permanent home, the trial court could have formed a firm belief, based on sufficient evidence, that the Renteria family home is not Marisa's domicile, or that Marisa lacked sufficient bodily presence. The trial court did not abuse its discretion in determining that Contestants met their burden to prove by clear and convincing evidence that Marisa did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (h) Marcella Renteria

The trial court determined Marcella Renteria—Ysidro's niece and Joe's daughter who currently works for the Loving County and District Clerk's office—is not a Loving County resident. Prior to 2023, the documentary evidence established she lived in Monahans[28] and was not a Loving County resident when she voted, though it made "no finding as to her current residency status." Contestees and Renteria family Non-Party Voters argue that the evidence shows she resides at the Renteria family's home in Mentone and any absence from Loving County was temporary.

Marcella testified that she too grew up in Mentone in the Renteria family's home. After graduating from high school, she moved to Kermit, where her children attended school. Marcella stated that her teenaged children now live independently in her mother's home in Monahans, and she lives with them "occasionally." She testified that she began working at the Loving County and

---

[28] Monahans is the seat of Ward County.

District Clerk's Office in January 2023, and that is why she is not living at the Monahans house with her children. But she confirmed that before she got this job, she lived in Kermit with her children while they attended school. Marcella testified that her driver's license lists the Renteria family's home as her address, but she acknowledged that it was issued in May 2023, and before that date, her driver's license listed a Monahans address.

Although Marcella's circumstances have since changed, the evidence was sufficient for the trial court to have formed a firm belief that at the relevant time, Marcella lacked the requisite volition, action, and intent to establish residency in Loving County. Thus, the trial court did not abuse its discretion in determining that Contestants met their burden to prove by clear and convincing evidence that she did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (3)  Members of the Haley family

Four members of the Haley family are at issue in this appeal: Alan Haley; his wife, Barbara Haley; Alan's stepdaughter, Julia Derrick; and Alan's brother, Mark Haley. The trial court determined that all four were residents of Loving County and eligible to vote in the November 2022 election. Contestants challenge the trial court's findings, pointing in large part to the fact that while the challenged Haley voters all claim a three-bedroom trailer on the Haley Ranch as their residence, none of the four have any ownership interest in the ranch. Contestants also point out that none have a designated bedroom, and they stay on the ranch only periodically while owning homes in other counties.

### (a)  Alan Haley

The trial court determined Alan Haley was a Loving County resident at the time of the November 2022 election. The court found that Alan first registered to vote in Loving County in

1974 and has voted exclusively in Loving County ever since. It also found that Alan maintains personal belongings—which include "everything it take[s] to survive"—in his three-bedroom trailer home in Loving County, but he also owns additional properties in Loving County. The court found his driver's license lists an address that corresponds to the Haley Ranch in Loving County.

Contestants argue the documentary evidence shows Alan is a resident of Winkler County, pointing to Alan's homestead exemption on his home outside of Kermit, which he has owned for 18 years, and business documents, including deeds conveying mineral rights, listing Alan's residence address as outside of Loving County. Contestants argue that despite Alan testifying to his long family history in Loving County, the evidence shows Alan was not a Loving County resident in 2022.

Alan testified that he grew up in Loving County alongside the Renterias and Joneses and has considered Loving County his permanent residence since at least 1974. He testified that the Haley Ranch, where he claims a residence, has been in his family for 124 years. He stated that he stays in his trailer home in Loving County as often as he can, though he travels often to his other properties located outside of Loving County. His wife, Barbara, also testified that Alan is in poor health and requires care from her and his caretaker, Julia Derrick. Consequently, according to Barbara, Alan's condition poses an obstacle to completely relocating their lives to Loving County for the time being. Nonetheless, Alan acknowledged he does not have exclusive use of the home, as his brother also stays there, but noted that he keeps sufficient personal belongings in the home. He admitted he does not own surface rights in Haley Ranch, but he stated he owns other properties in Loving County and has a "lifetime residence" in Haley Ranch granted by his father. Alan also testified that he serves as the Republican Chair of Loving County.

Despite some evidence to the contrary, legally and factually sufficient evidence supports the trial court's conclusion that Contestants failed to meet their burden in challenging Alan's residency. Alan's temporary absence from Loving County on account of his health does not vitiate his Loving County residency. *See McGehee*, 200 S.W.2d at 698 (listing illness as a legitimate justification for being temporarily absent). The trial court did not abuse its discretion in finding that Alan is a resident of Loving County and was eligible to vote there in the November 8, 2022 election.

### (b) Barbara Haley

The trial court concluded Barbara Haley, Alan's wife, is also a Loving County resident. The court found Barbara's Loving County residency is supported by her driver's license, years of service as an election worker there, retirement from the Loving County Appraisal Board, and service as a member of a Loving County jury. The court also noted Barbara confirmed her Loving County residency in response to letters sent by the Loving County Sheriff and Voter Registrar. The court concluded that although Barbara and Alan sometimes stay at another home in Kermit, Barbara's intent is to make the Haley Ranch their permanent home once Alan's health improves.

Contestants challenge the trial court's findings for Barbara on much of the same basis as Alan. Additionally, Contestants argue that Barbara's Facebook page shows she lives in Kermit, where she was served with the trial subpoena and registered her vehicle. Contestants point to Barbara's testimony about the frequency of her stays in Loving County—which amount to once or twice a month—and the fact that she testified to having been in Loving County only three or four times in 2022.

Barbara testified that she is originally from Kermit, Texas but has been a Loving County-registered voter since marrying Alan over 20 years ago. She discussed that since retiring, she

travels from her Kermit home to their trailer home in Loving County, where she keeps personal belongings and spends the night once or twice a month. Barbara testified that she plans on living in Loving County full time once Alan, who is recovering from poor health, recovers.

Sufficient evidence supports the court's finding that Barbara Haley was a Loving County resident for purposes of the November 8, 2022 election. The evidence shows Alan's condition occasionally necessitates the Haleys' temporary absence from Loving County. But where a caretaker temporarily leaves the county to nurse an ill relative, she does not lose her residence for voting purposes if she continues to maintain a home in the county where she votes. *See Guerra*, 406 S.W.2d at 777 (holding caretaker did not lose residence where she was absent from the county to nurse her ill husband but still had a home in the county and kept personal belongings there). Because legally and factually sufficient evidence supports the trial court's conclusion that Contestants failed to meet their burden in challenging Barbara's residency, it did not abuse its discretion in finding that Barbara is a resident of Loving County and was eligible to vote there in the November 8, 2022 election.

### (c) Julia Derrick

The trial court determined that Julia Derrick, Alan's stepdaughter, was a Loving County resident at the time of the November 2022 election, concluding that Contestants did not meet their burden of challenging her residence because they did not elicit any testimony from Julia at trial. Further, the court found that other witnesses' testimony confirmed her residency, including Barbara's testimony regarding Julia's employment as Alan's full-time caretaker and Mark Haley's testimony, in which he stated that Julia resides at their Loving County home and recalled seeing her there in 2022.

Contestants argue the trial court erred in finding Julia is a resident of Loving County by pointing to contradictory testimony, which they contend shows Julia has not lived in Loving County for several years. For example, Tina Burrows, who worked in the courthouse annex where Julia was a janitor, testified that Julia left Loving County years ago, and she has only seen her once since. Mark Haley testified that he last saw Julia a month ago, and to his knowledge, Julia was no longer taking care of Alan. Mozelle testified that she thinks Julia lives outside of Loving County. Finally, Contestants point to Julia's Facebook postings, which they contend show she does not live in Loving County.

Julia did not testify at trial. However, the trial court's findings based on the testimony of Julia's relatives are supported by the record. The burden fell on Contestants to prove by clear and convincing evidence that Julia did not meet the residency definition. *See Flores*, 269 S.W.3d at 660. Because legally and factually sufficient evidence supports the trial court's conclusion that Contestants failed to meet their burden in challenging Julia's residency, it did not abuse its discretion in finding that Julia is a resident of Loving County and was eligible to vote there in the November 8, 2022 election.

### (d) Mark Haley

The trial court determined Mark Haley, Alan's brother, was a Loving County resident and eligible to vote in the November 2022 election. The court found that Mark's current and prior driver's licenses and voter registration cards confirm his address is in Loving County, where he has voted since 1976. The court recognized that Mark has suffered from health problems that have required him to leave Loving County, but Mark intends to return to Loving County once he recovers.

Contestants argue the evidence shows that Mark lives in Kermit, not Loving County. Contestants highlight that Mark has maintained a home in Kermit since approximately 2005, noting that both of his daughters attended high school in Kermit. Further, Contestants argue documentary evidence, like deeds, tax records, and vehicle registration paperwork, establish that Mark resides outside of Loving County. Contestants equate Mark to a family guest at the Haley Ranch trailer rather than a Loving County resident.

Mark testified that while he grew up on Haley Ranch, he attended high school in Pecos and Ft. Stockton before working as a cowboy and roughneck throughout West Texas, including Loving County. Later, Mark worked a construction job that required him to travel to various jobsites in the United States, but he returned to Loving County and stayed at the Haley Ranch for the holidays. Mark stated that he is semi-retired now and runs cattle on leased land in Loving and Winkler counties. Though Mark acknowledges that he owns a home in Winkler County, he claims as his residence the same three-bedroom trailer home on Haley Ranch, where he keeps personal belongings, such as clothes, photos, and kitchenware. Mark said that his medical condition kept him from staying at the trailer as much as he would like, but once he is fully recovered, he "absolutely" intends to stay at the trailer on Haley Ranch.

Despite some evidence to the contrary, legally and factually sufficient evidence supports the trial court's conclusion that Contestants failed to meet their burden in challenging Mark's residency. Just as in Alan's case, Mark's temporary absences from the county due to health issues do not negate his Loving County residence. *See McGehee*, 200 S.W.2d at 698. The trial court did not abuse its discretion in finding that Mark is a resident of Loving County and was eligible to vote there in the November 8, 2022 election.

42

**(4) The Jones-Carr family**

Contestees challenge the trial court's determination that three members of the Jones-Carr family are not residents of Loving County: RayChel Lowrance (Mozelle's daughter), Wesley Lowrance (RayChel's husband), and Rachel Jones (Mozelle's niece-in-law). Contestants challenge the trial court's determination that three other members of the Jones-Carr family are Loving County residents: Matthew Jones (Mozelle's nephew), Catherine "Caydee" Carr (Mozelle's daughter), and Tyler Simenson (Mozelle's cousin).

**(a) RayChel Lowrance**

The trial court found that RayChel Lowrance, Mozelle's daughter, is not a Loving County resident. The court specifically noted that RayChel grew up outside of Loving County and attended college and graduate school in Lubbock. Since getting married, she and her immediate family have remained in Lubbock. The court cited evidence from other witnesses who testified RayChel resides in Lubbock.

Contestees and Jones-Carr family Non-Party Voters argue that RayChel is a resident of Loving County, and Contestants failed to meet their burden to show otherwise. They point to her driver's license, which lists a Loving County home (referred to by multiple parties as the "Ritz") as her address, and the fact that RayChel has always considered herself part of the Loving County community. Although Contestees acknowledge RayChel was removed from the voter roll in 2006, they maintain her circumstances have drastically changed since then. For example, she and her husband have a two-year lease on the Ritz, which they acquired prior to registering to vote in 2022. Contestees maintain that RayChel's ties to Lubbock are solely for work and her children's education. Otherwise, RayChel considers the Ritz their "permanent forever home."

RayChel testified that she has lived in Lubbock since getting married, noting that her three young children attend private school there because there is no equivalent religious schooling in Loving County. She attested that she does not intend to retire in Lubbock but is there only for her children's education. She testified to a long list of personal belongings that she keeps at the Ritz and described the various activities her children partake in while they are in Loving County. RayChel opined that between her Lubbock and Loving County homes, she considers Loving County to be her permanent residence.

The trial court's finding that RayChel is not a Loving County resident is supported by sufficient evidence. Notwithstanding RayChel's intent to one day retire in Loving County, a voter's intent alone is insufficient to establish residency. *Streater*, 896 S.W.2d at 246. There must be a nexus of a person's volition, intention, and action to fix and determine residency. *Woods*, 363 S.W.3d at 715. With respect to RayChel and her husband, the evidence shows the bulk of their family life is spent in Lubbock—and has been since the Lowrances married. Based on this evidence, the trial court could have formed a firm belief that much of RayChel's adult life has been spent in Lubbock, and her intent to reside in Loving County is too attenuated. Thus, the trial court did not abuse its discretion in finding that the Contestants met their burden to show RayChel did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (b) Wesley Lowrance

The trial court likewise determined that Wesley Lowrance—RayChel's husband—was not a resident of Loving County at the time of the election. The court relied on Facebook postings, utility bills, Wesley's driver's license, and business documents to support its finding that Wesley is not a Loving County resident. It also noted Wesley's testimony regarding where his vehicles are

registered, where he spends most of his time, and where his career is centered proves that Wesley is not a Loving County resident but instead lives in Lubbock.[29]

Contestees and Jones-Carr family Non-Party Voters contend the trial court abused its discretion in finding Wesley was not a Loving County resident in 2022. They highlight Wesley's business interests in Loving County, urging that this demonstrates the requisite action, intent, and volition to reside in Loving County. They also point to Wesley's testimony that he returns to the Ritz regularly and keeps personal belongings there. And Contestees argue that the trial court's references to Facebook statuses, utility usage, or Wesley's ties to locations outside of Loving County do not bear on the test for residency.

Wesley testified that he has a career in commercial real estate that is based in Lubbock and mostly concerns Lubbock properties. Wesley's driver's license lists a Lubbock address, and he testified he owns vehicles registered in Lubbock. He acknowledged that 2022 was the first year he registered to vote in Loving County, and he was previously registered to vote in Lubbock. He testified that he visits the Ritz in Loving County "fairly regularly" but acknowledged that most of his time is spent in Lubbock. Though Wesley said he now considers Loving County his "permanent residence" that the Lowrances "maintain," he admitted he did not consider it as such when he registered to vote in Loving County.

---

[29] The trial court specifically found that Wesley and RayChel Lowrance registered to vote on September 19, 2022, and this was the first time Wesley registered to vote in Loving County. Still, their utility bill for their Lubbock home showed considerable consumption of electricity during the summer months, suggesting that they spent most of their time in Lubbock in 2022 and raising suspicion about their claimed Loving County residency under subsection (f) of the Election Code. *See* Tex. Elec. Code Ann. § 1.015(f) ("A person may not designate a previous residence as a home and fixed place of habitation unless the person inhabits the place at the time of designation and intends to remain."). However, as explained above, sufficient evidence existed for the trial court to find that the Lowrances failed to meet the definition of "residence" under subsections (a), (b), and (c) of the Election Code and case law such that, setting aside (f), we can still affirm its conclusion.

Despite some evidence to the contrary, the trial court's finding that Wesley is not a resident of Loving County is supported by legally and factually sufficient evidence, as it could have formed a firm belief under these facts that Wesley lacked the requisite volition, action, and intent to make Loving County his permanent home. As with RayChel, the evidence related to Wesley permitted the trial court to reasonably infer that in 2022, he did not intend to remain in Loving County; indeed, Wesley said as much when asked whether the Ritz was his permanent residence upon registering to vote. Further, evidence regarding Wesley's business ties to Lubbock and the amount of time the Lowrances spend there allowed the trial court to reasonably infer a lack of bodily presence in Loving County and conclude the Lubbock home is his fixed place of habitation. *See* Tex. Elec. Code Ann. § 1.015(a). Thus, the trial court did not abuse its discretion in determining that Contestants met their burden to prove by clear and convincing evidence that Wesley did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (c) Rachel Jones

The trial court determined that Rachel Jones (Matthew Jones's wife) is not a Loving County resident but instead lives in Wink.[30] It found Rachel registered to vote for the first time about a week before the deadline for the 2022 general election and noted that her driver's license and concealed handgun license both list Wink as her address. The court also noted Rachel admitted to staying in Mentone only on weekends because she has school-aged children.

Contestees and Jones-Carr family Non-Party Voters contend the trial court erred in determining Rachel is not a Loving County resident, also focusing on the inconsistent findings between Rachel and Matthew. They maintain Rachel's testimony establishes that the Mentone home is her residence, and the photographic evidence demonstrates the same. They also argue

---

[30] Wink is a city in Winkler County.

46

Rachel's testimony confirmed her intention is to return to Loving County, despite any temporary absence.

Rachel testified that she grew up in Gatesville and lived there until approximately 2018, when she and Matthew moved to Wink. Rachel agreed that she and Matthew had a homestead exemption on their Wink home, but she maintained that she has plans to live full-time in Mentone on the property deeded to her and Matthew. However, she admitted that she did not have "a set time" for that plan and could not remember how many days she spent at the property in the past several months. Rachel acknowledged that Loving County lacks an elementary school, and she spends time outside the county so her children can attend school programs, including a childcare program in Monahans. And while she could not specify the number of days she spends in Loving County, she agreed that during the school year, it would only be on the weekends. Likewise, Rachel could not recall staying in Loving County during the week when her son was attending childcare.

Although Rachel testified that she considers Loving County her permanent home, the trial court could have formed a firm belief, based on the evidence, that she lacked sufficient bodily presence to have ever made that her "home and fixed place of habitation" in the first instance. *See* Tex. Elec. Code Ann. § 1.015(a). While the trial court found her husband to be a Loving County resident, it did so under a different set of facts applicable specifically to Matthew, not Rachel. *Cf. Alvarez v. Espinoza*, 844 S.W.2d 238, 247–48 (Tex. App.—San Antonio 1992, writ dism'd w.o.j.) (concluding trial court's determination wife was a resident was error when the trial court found husband was a nonresident based "[o]n the same facts"). Additionally, while a temporary absence from the county may be justified on account of educating one's children, the trial court could have found that the evidence for Rachel—unlike her husband, Matthew—failed to demonstrate sufficient initial ties to Loving County to evince an intent to "return" and remain in the county. *Cf.*

*McBride v. Cantu*, 143 S.W.2d 126, 127–28 (Tex. App.—San Antonio 1940, no writ) (holding parents, who had lived and voted in the county for 24 years prior to the election contest, were residents of the county, which lacked a high school, despite being absent from the county to educate their children); *see also Woods*, 363 S.W.3d at 714 (relying on "circumstances . . . tending to show that the person is likely to remain at or return to the alleged residence" to determine a voter's residency). While opposing inferences could have been drawn from the evidence presented at trial, we defer to the trial court's resolution of conflicting evidence and determinations regarding witnesses' credibility in its role as fact-finder. Thus, the trial court did not abuse its discretion in determining that the Contestants met their burden to show by clear and convincing evidence that Rachel did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (d) Matthew Jones

The trial court determined that Matthew Jones is a Loving County resident. It found that Matthew "has called Loving County home his entire life," noting that several forms of documentary evidence established his Mentone address, including his driver's license, voter registration certificate, and hunting licenses. The court also remarked on several of Matthew's close relationships with individual Contestants and their families. And it found Matthew worked full-time in Loving County on his family's ranch.

Contestants urge the trial court erred in determining Matthew is a Loving County resident, largely focusing on the trial court's inconsistent residency findings as to Matthew (resident) and his wife, Rachel (not a resident). Instead, Contestants maintain Matthew lives in Wink, where he and Rachel are raising their two small children. They point to the low average electric consumption at the Joneses' Mentone home in the election year, arguing that the utility usage data suggests that

the home "was not fully operational" until late 2022. Contestants characterize the Joneses' home as Matthew's "work-related crash pad" and insufficient to establish his residency, given that his family lives in Wink.

Matthew testified that he grew up in Mentone and is now the manager at his family's ranch in Loving County. Matthew confirmed that his family's ranch includes a series of small five-acre lots, which his grandfather deeded to members of their family, including one to him and Rachel. He testified that his grandfather's intentions were to give him "something to call our own" and "something to be able to come back to and that we could build on it." Matthew described his job as more than "a Monday to Friday job," stating that he accordingly stayed overnight at their Mentone home often without his family. Matthew spoke directly to the utility usage at the Mentone property, noting that he got the electric meter at the home hooked up in 2021 but still relies on propane. But Matthew agreed that his family's house in Wink was closer to his son's school and was more "convenient" for his wife.

The evidence supports a finding that Matthew's living arrangement is different than that of his wife, Rachel. Whereas Rachel spends most of her time in Wink, Matthew's job at the ranch keeps him in Loving County the majority of the week, away from his family. Despite some evidence to the contrary, because legally and factually sufficient evidence supports its conclusion that Contestants failed to meet their burden in challenging Matthew's residency, the trial court did not abuse its discretion in finding that Matthew is a resident of Loving County and was eligible to vote there in the November 8, 2022 election.

### (e) Catherine "Caydee" Carr

The trial court determined that Catherine "Caydee" Carr—Mozelle's daughter—was a Loving County resident at the time of the November 2022 election. The court found that Caydee

lives with her grandmother, Mary Belle Jones, in Mentone and works as her grandmother's round-the-clock caretaker. The court found Caydee's documentary evidence—like her driver's license, voter registration certificate, vehicle registrations, and auto insurance—reflect a Loving County residence. And the court noted that Caydee's Loving County residence has been upheld in previous litigation despite her bouts of absence from Loving County to pursue educational and career opportunities.

Contestants argue that Caydee's own testimony proves she was a resident of Lubbock in 2022. Contestants point out that after being raised in Hockley County, Caydee worked for over a decade in Lubbock, where she rented a home. Contestants suggest that Caydee's testimony is inconsistent, as she "shifted" her testimony to reconcile her employment in Lubbock and purported residency in Loving County. Contestants also suggest that Caydee's change of address for her driver's license and voter registration card occurred suspiciously around the time that the Jones–Carr clan began changing their documentation to reflect Loving County residences. Further, Contestants maintain several documents used to support Caydee's Loving County residency were issued in 2023, or outside the scope of this election contest.

Caydee acknowledged that she worked in Lubbock for several years, both as a nurse and an apartment complex manager, but she claims to have managed a Loving County residence and full-time employment in Lubbock by traveling over the weekends and during her time off. And Caydee testified that in June 2022, she moved to Loving County to work as a live-in caretaker for her grandmother. Caydee testified she intends to stay in Loving County, which she considers home. In fact, she stated she obtained a career in nursing with the intent of caring for her family—namely, her grandmother—in Loving County. Caydee thus claims her grandparents' home as her residence. Given the timing of Caydee's move, her vehicle registration and car insurance reflect her Lubbock

50

address. But Caydee updated her driver's license and voter registration certificate in July 2022, so those documents now reflect her Loving County address.

Despite some evidence to the contrary, because legally and factually sufficient evidence supports its conclusion that Contestants failed to meet their burden in challenging Caydee's residency, the trial court did not abuse its discretion in finding that Caydee is a resident of Loving County and was eligible to vote there in the November 8, 2022 election.

### (f) Tyler Simonsen

The trial court determined that Tyler Simonsen—Carr's cousin—was a Loving County resident for voting eligibility in the November 2022 election. The court found Tyler has resided in Mentone "for several years" and has, in the past, been employed at the Jones family ranch. The court pointed to documentary evidence supporting Tyler's residency in Loving County as well as his intent to make Loving County his permanent home.

Contestants argue that the "overwhelming weight of the evidence" shows Tyler was a Montgomery County resident in 2022, including Tyler's testimony regarding his mail delivery and reliance on available internet in Montgomery County. Contestants also point to documentary evidence that lists Montgomery as his home address, including his car insurance. Additionally, Contestants maintain Tyler spends time in Montgomery helping his ailing parents, who receive cancer treatment in Houston, which they urge is likely a long-term commitment.

Tyler testified he was born in Houston and graduated from high school in Montgomery, Texas. After spending time in the military and in school, Tyler returned to Loving County in 2017. He worked for the Jones family ranch and lived in housing provided by the ranch for a couple years. In 2020, he left the ranch for Montgomery County to pursue work in the tech industry and secured a remote inside sales representative role. Tyler testified he has never considered

Montgomery home but worked out of his family's Montgomery home because of the faster internet speed. Though Tyler testified his family plans to sell the Montgomery house, he also acknowledged his parents currently receive medical treatment in Houston, which makes the Montgomery home a convenient place to stay.

When describing the Montgomery home, Tyler stated he does not have a dedicated bedroom. Likewise, in Loving County, Tyler said he sleeps on the couch but noted he keeps personal belongings, such as his birth certificate, social security card, employment contract, and clothes in Loving County. Tyler acknowledged he does not have the key to his family's Loving County P.O. box but testified that some of his mail goes to Loving County and other mail goes to Montgomery. As to documentary evidence, Tyler listed his Loving County address for his statement of residence card, voter registration application, liability insurance, and driver's license. Tyler testified that he considers himself permanently back in Loving County, as he has "for several years," and he stated he goes back and forth between Mentone and Montgomery just to help his parents. He estimates he returns home to Loving County "every few months."

While conflicting evidence was presented regarding Tyler's residency, the trial court acted within its discretion by resolving those inconsistencies. And because legally and factually sufficient evidence supports its conclusion that Contestants failed to meet their burden in challenging Tyler's residency, the trial court did not abuse its discretion in finding that Tyler is a resident of Loving County and was eligible to vote there in the November 8, 2022 election.

### (g) William Wilkerson

The trial court determined William Wilkerson is not a Loving County resident, finding instead that he lives in Kermit. Though the trial court acknowledged William "considers [Mentone]

his home and intends to return when he can," it concluded "all of the documentary evidence and Will's own testimony" establishes that he is not a Loving County resident.

Contestees argue that William is a Loving County resident and has lived in Mentone his whole life, except for a brief period after high school. They refute the trial court's conclusion that "all of the documentary evidence" establishes that William lives in Kermit, pointing to his driver's license and voter registration application which both have Mentone addresses. Contestees also note that William retains an interest in his family's home subject to his stepmother's life estate. To that end, Contestees urge that William intends to return to Loving County, particularly because, as William testified, his siblings do not intend to keep their respective interest in the property. Though Contestees acknowledge William currently lives in a camper that has moved around to different RV parks (and was in Winkler County during the trial), they maintain that William meets the statutory definition of a Loving County resident because of his intent to return to the family home.

William testified that he grew up in Mentone and lived there almost continuously until 2014, when he got married and moved to Wink. Following his divorce, he has been living in his girlfriend's camper for the past few years. Though the couple move the camper periodically, William agreed that he last lived in Loving County for three or four months in 2021 and has since been in Monahans and Kermit. Though William's driver's license and voter registration application lists a Mentone address, he acknowledged that his stepmother lives there now and does not permit him on the property (and has not since his father's passing). William also testified that his father died intestate, and his probate proceeding is still pending. But he stated that he intends to return to the family home in Mentone after his stepmother dies and considers Mentone his home.

There is sufficient evidence upon which the trial court could have formed a firm belief that William does not presently reside in Loving County and his intent to return to Loving County is

53

too tenuous to establish residency. Thus, the trial court did not abuse its discretion in determining Contestants met their burden to prove by clear and convincing evidence that William did not qualify as a resident of Loving County for purposes of voting in the November 8, 2022 election.

### (5) Conclusion

In many instances, the residency determinations turn on the trial court's resolution of conflicting evidence, as well as its assessment of many witnesses' credibility and the weight to afford their testimony. We defer to the same, and because there is sufficient evidentiary support for the trial court's residency determinations, we conclude that the trial court did not abuse its discretion in this regard. *See Woods*, 363 S.W.3d at 719 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)).

### E. Contestants' claims regarding election officials preventing two eligible voters from voting.

Contestants contend Loving County election workers illegally prevented Bradley Mayers and Homer McQueen from voting in Loving County's local races in the November 2022 election, and the trial court erred in finding otherwise. The relevant inquiry on appeal is whether Loving County election officials prevented eligible voters from voting in the contested elections.

### (1) Applicable law

To qualify as an eligible voter, a person must meet the requirements of a "qualified voter" outlined in § 11.002 on the day the individual presents to vote,[31] be a resident of the territory covered by the election for the office the person attempts to vote, and satisfy all other legal requirements for voting in that particular election. Tex. Elec. Code Ann. § 11.001(a). Two specific

---

[31] Section 11.002 states that a "qualified voter": (1) is 18 years old or older; (2) is a United States citizen; (3) has not been found by a probate court to be totally mentally incapacitated or partially mentally incapacitated without the right to vote; (4) has not been convicted of a felony, or if so, has fully discharged the sentence or been pardoned; (5) is a resident of Texas; and (6) is a registered voter.

types of ballots are relevant here: a limited ballot and a provisional ballot. An individual may vote using a limited ballot if she has recently moved to a new county of residence, but her voter registration in the new county will not be effective on or before election day. *Id.* § 112.002(a)–(b). The limited ballot is restricted to early voters or voters by mail and cannot be used on election day. *Id.* § 112.002(a). A limited ballot is also restricted to statewide elections, as well as offices and measures applicable to the voter's prior county of residence. *Id.* §§ 112.001, .004.

A provisional ballot is a way to ensure a voter's selections are preserved if her eligibility is uncertain when she presents to vote, regardless of whether that is during early voting or on election day. *See id.* §§ 63.001(g)(1), .0051(e), .009, .011. Section 63.009 of the Election Code states that a voter without a voter registration certificate whose name is not on the precinct's list of registered voters "shall be accepted for provisional voting if the voter executes an affidavit in accordance with Section 63.011." A provisional ballot is not restricted like a limited ballot; it is simply processed separately so election officials can analyze each voter's eligibility and determine whether to accept their provisional ballot. *Id.* § 65.054; *see also generally* §§ 65.051–.060.

### (2) Mayers and McQueen were deprived of their right to vote in local races.

Mayers and McQueen both recently moved to Loving County before the November 2022 election. In August 2022, both visited the Department of Public Safety to update their drivers' licenses, where they each also updated their voter registration addresses. However, neither of their names were on the Loving County voter roll when they presented to vote in the November 2022 election.

The undisputed evidence shows that Mayers attempted to vote early in Loving County, where he presented his driver's license with a Mentone address. Because he was not on the voter roll, Angela Medlin, the deputy voting clerk, sought guidance from the Texas Secretary of State's

office on how to handle Mayers's ballot. Medlin testified that the Secretary of State's office advised her to treat Mayers as a limited-ballot voter. She memorialized her conversation with the Secretary of State's office in a memo, which stated:

> On Wednesday October 27, 2022, a gentleman named[] Earl Bradley Mayers[] showed up in person to vote. He provided his Driver's License for identification with a Loving County address in Mentone. His name was not on the Loving County Voter Roll, so I called the Secretary of State. They advised me he can vote a 'Limited Ballot' and referred me to the SOS website. I followed the steps laid out on Election Advisory 2022–29. Then, I had the voter put his ballot in a Limited Ballot Envelope and place inside the regular early voting ballot box.

Mayers was thus presented with a limited ballot, which permitted him to vote in elections in which he would have been able to vote had he presented to vote in his previous county of residence, Travis County. That meant Mayers's ballot did not include any of the three races contested here.

Mayers did not testify at trial, but Contestants admitted in evidence confirmation from the DPS that Mayers registered to vote in Loving County on August 4, 2022—well before the deadline for the November 2022 election.[32] The evidence was not disputed. However, the trial court determined Mayers "was still registered to vote in his prior county, Travis County," on October 27, 2022, and "Contestants fail[ed] to prove by clear and convincing evidence that Bradley Mayers was an eligible Loving County voter."

McQueen attempted to vote on the day of the election. He too brought his driver's license with a Mentone address but was not on the voter roll. Relying on the advice that Medlin received from the Secretary of State's office for Mayers, election officials provided McQueen with a

---

[32] The deadline to register for the November 2022 general election was October 11. https://www.sos.state.tx.us/elections/laws/nov-8-election-law-calendar-2022.shtml#October (last visited August 5, 2024); *see* Tex. Elec. Code Ann. §§ 1.006, 13.143, 15.025(d). It appears that Mayers's registration to vote in Loving County was not timely transmitted from the DPS system, such that neither Loving County's voter roll nor Travis County's voter roll were timely updated.

"limited provisional ballot." That is, McQueen received a provisional ballot with local races struck through, but he also completed an affidavit of provisional ballot under § 63.011.[33]

Contestants argue Mayers and McQueen should have each been provided with a full provisional ballot, rather than a ballot that excluded local races, because they each presented to vote with a driver's license reflecting a Mentone address and stated they registered to vote in Loving County. Thus, Contestants urge that the Loving County election officials erred in preventing Mayers and McQueen from preserving their votes in local races through a provisional ballot and in processing Mayers's and McQueen's ballots.[34] They maintain the trial court abused its discretion in concluding otherwise.

The undisputed record evidence establishes that Mayers registered to vote in Loving County on August 4, 2022, which Loving County's deputy tax assessor collector (whose job responsibilities also include voter registration) confirmed by query to the DPS in May 2023. Thus, the trial court's findings that (1) Mayers was still registered to vote in Travis County when he presented to vote early in Loving County, and (2) Contestants failed to establish that Mayers was an eligible Loving County voter are not supported by any evidence. Because Mayers attempted to vote with valid identification—but was not on the Loving County voter roll and did not have his voter registration card—he should have been provided with a provisional ballot to preserve his vote while election officials determined whether he was eligible. *See* Tex. Elec. Code Ann.

---

[33] Contestants provided as evidence McQueen's § 63.011 provisional voter affidavit; the record contains no such affidavit by Mayers.

[34] Contestants further allege that Mayers's and McQueen's votes were not counted because Loving County election officials erred in processing the ballots. Specifically, Contestants allege Loving County election officials never notified the voter registrar of the ballots, which would have triggered the statutorily mandated process for reviewing provisional ballots by which the voter registrar determines whether the provisional voters were properly registered. *See* Tex. Elec. Code Ann. §§ 65.051–.060. Because we determine both Mayers and McQueen were eligible voters who were otherwise denied the right to vote in local elections, we do not reach Contestants' arguments regarding Loving County election officials' post-election treatment of Mayers's or McQueen's ballots.

§§ 63.009, .011; *see also Gonzalez v. Villarreal*, 251 S.W.3d 763, 780–81 (Tex. App.—Corpus Christi 2008, pet. dism'd) (discussing statutory safeguards in place to ensure a voter's eligibility while preserving the voter's selections).

Likewise, the undisputed evidence establishes that McQueen registered to vote in Loving County on August 12, 2022. Thus, the trial court's finding that Contestants failed to establish that McQueen was an eligible Loving County voter is not supported by any evidence. Like Mayers, McQueen should have been provided with a provisional ballot to preserve his vote while election officials determined whether he was eligible.[35] *See* Tex. Elec. Code Ann. §§ 63.009, .011. There is no authority supporting the Loving County election officials' decision to provide McQueen with a "limited provisional ballot"—i.e., a § 63.011 provisional ballot that had been altered to remove local races, applicable to registered voters who moved from the county in which they are registered to a new county in which they will not be registered before election day and voting only during the early voting period. *See* Tex. Elec. Code Ann. §§ 112.001–.012.

Thus, the undisputed evidence establishes that Mayers and McQueen were eligible to vote in Loving County's local races, though it also appears to be undisputed that neither Mayers nor McQueen were registered in Precinct 2. Therefore, they were eligible to vote in the Loving County and District Clerk's race and the Justice of the Peace race, but not the Commissioner Court race at issue here. Because both Mayers and McQueen were given ballots that excluded local elections, they did not have the opportunity to vote in either race. No evidence countered the fact that Mayers and McQueen registered to vote before the deadline or that they were not provided with full

---

[35] And because McQueen voted on election day, he should not have been presented with a limited ballot because a person may vote a limited ballot only during early voting or by mail. Tex. Elec. Code Ann. § 112.002.

provisional ballots. That is, Loving County election officials prevented these two eligible voters from voting in two of the races contested here.

Contestees urge that Contestants failed to establish how the purported errors with Mayers's and McQueen's ballots materially affected the election. But Texas law has long provided that "[i]f the right of a voter to vote has been denied to any person duly qualified, it may be shown in case of a contest. And if the number of voters whose right has been so denied is large enough to materially affect the result it will vitiate the election." *McCurry v. Lewis*, 259 S.W.3d 369, 376 (Tex. App.—Amarillo 2008, no pet.) (quoting *McCormick v. Jester*, 115 S.W. 278, 284 (Tex. App.—Dallas 1908, writ dism'd)). This is true even if the election officer merely "made a mistake." Tex. Elec. Code Ann. § 221.003(a)(2)(C); *see Perez v. Alanis*, No. 04-08-00276-CV, 2008 WL 3457035, at *4 (Tex. App.—San Antonio Aug. 13, 2008, no pet.) (mem. op.).

By the final canvass of votes in the contested Loving County and District Clerk's race, Mozelle prevailed by 12 votes. Even after finding that ten illegal votes had been cast in that election, the trial court affirmed the result because Mozelle's margin of victory exceeded the number of illegal votes. But the trial court abused its discretion in determining that Contestants failed to prove Mayers and McQueen were illegally prevented from voting. Because the undisputed facts establish that Mayers and McQueen attempted to and were eligible to vote in the Loving County and District Clerk race in the November 2022 election but were prevented from doing so by Loving County election officers, the trial court should have added two voters to those legally allowed to vote. Coupled with subtracting ten illegal votes from the final canvass of votes, the total voting differential was 12. Had the trial court added Mayers and McQueen to the canvass, it would not have been able to declare the true outcome of the Loving County and District Clerk election because the total number of eligible but prevented votes plus the illegal votes equal

Mozelle's margin of victory. Thus, the trial court's obligation was to declare that election void. Tex. Elec. Code Ann. §§ 221.003(a)(1)–(2)(A), .012(b).

We sustain Contestants' issue on this point. We reverse the trial court's finding affirming the results of the Loving County and District Clerk's race and declare it void.

### F. Contestants' claim regarding the new election

Finally, Contestants contend the trial court abused its discretion by not ordering the County to hire a third party to run the new election but instead ordering Mozelle Carr to run it. In support, Contestants cite only to § 231.007 of the Election Code, which provides that the trial court *may* designate another person to conduct the new election when the person who would normally perform those duties is a party to the election contest. Because the language in the statute is discretionary and Contestants have not provided additional argument or authorities in support of their position, we cannot say that the trial court abused its discretion in making this ruling. *See Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.) (noting that it would be "inappropriate" for appellate court to articulate what it believes appellant's argument to be).

## IV. CONCLUSION

Having disposed of all Contestants', Contestees', and Non-Party Voters' issues on appeal, a summary of our holdings follows:

Contestants' motion to dismiss is denied as it relates to the Non-Party Voters' standing. We do not reach Contestants' motion to dismiss Contestees' constitutional claims.

The trial court did not abuse its discretion in declining to enter a protective order regarding the subpoenas duces tecum.

The trial court did not abuse its discretion by overruling Contestees' challenges to Ragland's expert testimony.

60

The evidence is legally and factually sufficient to produce in the mind of the trial court judge a firm belief or conviction that the ten voters it found cast illegal votes did not have residency in Loving County and were thus ineligible to vote in the November 2022 general election. The trial court did not abuse its discretion in so concluding and subtracting those votes from the total canvass. Similarly, the trial court did not abuse its discretion in finding that the other nine voters at issue in this portion of the appeal legally voted in Loving County. We affirm the trial court's residency findings as to all 19 voters challenged on appeal.

We further conclude that the undisputed evidence establishes that Bradley Mayers and Homer McQueen were illegally prevented from voting in the November 2022 local elections. We reverse the trial court's judgment as to Bradley Mayers and Homer McQueen.

Upon subtracting the number of voters who illegally cast ballots and adding the two eligible voters who were improperly prevented from voting in the Loving County and District Clerk race, the differential now equals the margin of error in that race (12). Accordingly, we remand the proceeding for the trial court to void that election and order a new election for Loving County and District Clerk as well. *See* Tex. Elec. Code Ann. §§ 231.007, 232.041.

We affirm the trial court's judgment in all other respects.

The trial court did not abuse its discretion by declining to require a third party to run the new elections.

Finally, we order that any motion for rehearing must be filed within ten days of the date of this opinion. *See* Tex. Elec Code Ann. § 232.014(e); *Rangel*, 679 S.W.3d at 925. We will not entertain any requests to extend the deadline to file a motion for rehearing. The mandate will issue

immediately after ten days pass or we dispose of any timely filed motions for rehearing, whichever is later.[36]


LISA J. SOTO, Justice

August 16, 2024

Before Alley, C.J., Palafox and Soto, JJ.
Palafox, J., dissenting

---

[36] We deny Contestants' August 12, 2024 motion requesting us to issue an order prohibiting any motion for rehearing and limiting the time to file a petition for review, as well as issue the mandate with the opinion.